## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

        Plaintiff,

v.

Heriberto Penaloza-Romero,

        Defendant.

File No. 13-cr-36 (RHK/TNL)

**REPORT
&
RECOMMENDATION**

---

Allen A. Slaughter Jr, **United States Attorney's Office**, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for Plaintiff); and

Paul J. Edlund, **Attorney at Law**, 220 South Sixth Street, Suite 215, Minneapolis, MN 55402 (for Defendant).

---

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant's Motion to Suppress Electronic Surveillance (ECF No. 19) and Motion to Suppress Fruits of Unlawful Search and Seizures (ECF No. 20). This matter has been referred to the Court for report and recommendation pursuant to D. Minn. LR 72.1(a)(3)(A). On May 29, 2012, this Court held a hearing on the Motions. Special Agents Oleg Sokolov, Travis Hamblen, and Jeffrey Benadum of Homeland Security Investigations testified, and the following Government Exhibits were offered and received: Exhibits 1A-1L are photographs showing the fruits of a search warrant executed in Fridley, Minnesota, on April 5, 2012; Exhibits 2A-2N are the court-permitted tools[1]

---

[1] Exhibits 2A, 2C, and 2E authorize the disclosure of latitude and longitude relating to wireless telephones, establishing the phones' approximate location. This tool is frequently referred to as a

used during the investigation and the affidavits filed in support of those tools; Exhibits 3A-3C are DEA 7 Reports regarding controlled buys of drugs from the Defendant on September 10, 2012, November 9, 2012, and February 13, 2013; Exhibits 4A-4D are photographs from the controlled buy on February 7, 2013; Exhibit 5 is the Hennepin County search warrant application, affidavit, and return for 3300 Colfax Avenue, Apartment 104, Minneapolis MN; Exhibits 6A-6K are photographs of February 14, 2013 surveillance of Defendant's automobile and associates; Exhibits 7A-7E are photographs of the evidence recovered pursuant to the search warrant issued in Exhibit 5; Exhibit 8 is a DEA 7 Report regarding evidence recovered pursuant to the February 15, 2013 search of 3300 Colfax Avenue; Exhibit 9 is a photograph of a keychain recovered on February 15, 2013; Exhibit 10 is a consent form executed by Dafne Morales on February 15, 2013 for a search of 4145 Parklawn Avenue, Apartment 324, Edina, MN; Exhibits 11A-11O are photographs of the evidence recovered pursuant to the search of 4145 Parklawn; Exhibit 12 is the lease agreement for 4145 Parklawn; Exhibit 13 is the inventory from the 2004 Acura seized in connection with this case; and Exhibit 14 is a packet of Homeland Security Investigations policy materials. Based upon the record, memoranda, and proceedings herein, this Court will recommend that Defendant's Motions be denied.

## I.  BACKGROUND

Authorities previously knew Defendant as an illegal alien who was removed from the country three times, most recently on April 9, 2010. (Tr. 15:8-19, ECF No. 25.) In

---

"ping" by law enforcement and is referred to as such throughout this Report and Recommendation. "Ping" is also used as a verb when this data is being disclosed.

July 2011, an investigation into a cash smuggling operation began.  (Tr. 16:18.)

Defendant was identified as being responsible for attempting to smuggle $400,000.  (Tr.

16:22-17:3.)  The investigation involved Homeland Security Investigations-Saint Paul,

Homeland Security Investigations-Miami, and DEA-Minneapolis with other local law

enforcement agencies supporting.  (Tr. 16:19-21, 26:18-23.)  Defendant was adept at

countersurveillance techniques, which made physical surveillance difficult.  (Tr.

23:4-13.)  Throughout the course of the investigation, Defendant frequently switched

vehicles and phones and utilized driving maneuvers that made him difficult to follow.

(Tr. 23:3-4, 10-12.)  He was also known to be very transient, staying with multiple

acquaintances and family members without spending much time in any one place.

(Tr. 24:2-19.)

### A.    Controlled Purchases Involving Defendant

On September 10, 2012, investigators arranged a controlled purchase of

methamphetamine from Defendant.  (Tr. 36:17-18.)  A confidential informant ("CI")

called Defendant and arranged a meet location.  (Tr. 36:20.)  That afternoon, Defendant

delivered a small sample of methamphetamine.  (Tr. 39:23-24.)  Multiple calls

subsequently took place between the CI and Defendant, monitored by law enforcement.

(Tr. 37:4-5, 38:1-5.)  The CI met Defendant on foot and the two proceeded to walk in a

three block radius conducting countersurveillance.  (Tr. 38:9-12.)  Defendant delivered

31 grams of methamphetamine to the CI in exchange for $1,000.  (Tr. 36:21, 39:2-14; Ex.

3A.)

A second controlled purchase with Defendant occurred on November 9, 2012. (Tr. 41:7-8.) It was agreed that 66 grams of methamphetamine would be exchanged for $2,000. (Tr. 41:8-12.) For this buy, Defendant informed the CI he would not personally be delivering the methamphetamine. (Tr. 41:13-15.) Defendant instructed the CI to go to a Home Depot in Inver Grove Heights. (Tr. 41:16-17.) There, an individual met the CI and exchanged the drugs for the money in a bathroom. (Tr. 41:23-24.)

A third controlled purchase from Defendant occurred on February 7, 2013. (Tr. 42:9-11.) Multiple phone calls were again placed to arrange the purchase. (Tr. 42:12-13.) This deal was for 4.1 ounces of methamphetamine in exchange for $2,000 at the time of purchase and an additional $1,600 to be paid in a week's time. (Tr. 42:22-25; Ex. 3C.) This deal took place at a Home Depot near Northeast Minneapolis. (Tr. 42:14-15.) At the arranged time, Defendant arrived at the Home Depot in a gray 2004 Acura TSX ("the Acura"). (Tr. 42:17-18; Ex. 4A-B.) Defendant proceeded to the bathroom where the transaction with the CI took place. (Tr. 42:20-21.) Defendant was accompanied on this trip by an individual later identified as Eleuterio Izazaga-Pascacio ("Izazaga"), also known as "El Tigre."[2] (Tr. 42:18, 46:8-16; Ex. 4C–D.)

## B. Discovery of the Colfax Apartment

On February 7, 2013, the same day as the third controlled buy, a "ping" order of a cellular telephone then being used by Defendant was issued. (Tr. 48:13-14; Ex. 2C.) On February 11, 2013, Defendant's phone pinged that he was in Hinckley, Minnesota, and

---

[2] The evidence refers to the same individual sometimes as El Tigre and sometimes as Izazaga. For clarity, this Court will use "Izazaga" where "El Tigre" is referenced in the record.

investigators began physically to surveil him there. (Tr. 49:24-50:1.) Law enforcement ultimately followed Defendant to an apartment building located at 3300 Colfax Avenue in Minneapolis ("the Colfax apartment"). (Tr. 49:3-7.) One of the mailboxes to that building identified a unit rented in the name of "Padilla-Valle." (Tr. 49:15-16.) Information received by law enforcement identified an Ernesto Padilla-Valle as part of a separate criminal organization with close ties to Defendant. (Tr. 49:20-23.) Based on information revealed by the phone ping, law enforcement determined that Defendant was staying at the Colfax apartment from February 11 to the morning of February 14. (Tr. 54:19-22.)

Before February 13, the caretaker/manager of the Colfax apartment building was contacted by Special Agent Benadum. (Tr. 231:21-232:1.) Agent Benadum identified himself as law enforcement to the manager. (Tr. 231:9-11.) Agent Benadum told the manager that Homeland Security "would like to, if [they] could get in," enter the building to perform a dog sniff of the apartments. (Tr. 231:15-16, 232:19.)

The manager met law enforcement officers at the apartment building at 6 a.m. on February 13, 2013, and opened the door for them. (Tr. 231:3-7.) Agent Benadum, Officer Ross Lapp of the Minneapolis Police Department, Detective Amy Kilian of the Minneapolis Airport Police, and Detective Kilian's canine partner "Domino" were all present. (Tr. 227:19-21; Ex. 5 at 2.) The dog sniff occurred in the common hallway of the building. (Tr. 51:4-6.) Domino positively alerted to the presence of narcotics after sniffing the bottom seam of the door to apartment 104. (Ex. 5 at 2.) The building manager also confirmed for law enforcement that Ernesto Padilla-Valle rented apartment

104.  (*Id*.)  On February 14, 2013, Hennepin County District Judge Lloyd Zimmerman issued a search warrant based on the dog sniff of apartment 104, the landlord's confirmation that the apartment was leased to Padilla-Valle, and a CI's identification of a photo of Padilla-Valle as an individual involved in distributing methamphetamine.  (*Id*. at 1-3.)

### C.  Discovery of the Parklawn Apartment

On February 13, 2013, law enforcement installed a vehicle tracker on the Acura. (Tr. 55:6; Ex. 2D.)  On February 14, 2013, surveillance of the vehicle began after it was located at Whole Foods in Edina.  (Tr. 55:7-8.)  Izazaga was with the Acura along with an individual who investigators at that time believed to be Ernesto Padilla-Valle.  (Tr. 55:9-10.)  This individual was later identified as Miguel Morales-Villareal ("Morales"). (Tr. 56:8-17.)  Although the GPS tracker malfunctioned at some point that day (Tr. 61:19-24), investigators physically followed the vehicle from Whole Foods to the Oriental Food Market in Saint Paul, to a Perkins in Saint Paul, and then to a Boston Market in Richfield.  (Tr. 55:7-59:9; Exs. 6A-6G.)  At the Boston Market, Izazaga and Morales accepted payment for the outstanding $1,600 due from the February 7, 2013 controlled purchase.  (Tr. 58:11-15.)  Law enforcement followed Izazaga and Morales to an apartment complex at 4145 Parklawn Avenue in Edina.  (Tr. 59:14-15; Ex. 6H.)  Later that day law enforcement observed the Acura back at the Colfax apartment. (Tr. 62:17-18.)  That evening, investigators followed pings from Defendant's cell phone from the Colfax apartment to the Parklawn apartment.  (Tr. 62:22-24.)

**D.    Search of the Colfax Apartment and Defendant's Arrest**

On February 15, 2013, law enforcement decided to execute the search warrant on the Colfax apartment. (Tr. 65:12-13.) Surveillance of the building began at approximately 11:30 a.m. (Tr. 164:4-8.) Around 12:50 p.m., Defendant arrived at the Colfax apartment building in the Acura along with Izazaga and Morales. (Tr. 65:18-24, 164:12-15.) The three men entered the Colfax apartment building. (Tr. 65:21-24.) Around 1:15 p.m., Morales exited the building and placed a bag inside the Acura. (Tr. 65:24-66:1, 165:15-18.) Defendant and Izazga also exited the building and placed bags inside the Acura. (Tr. 66:1-3, 165:44-166:2.) All three men—Defendant, Izazaga, and Morales—then left in the Acura. (Tr. 66:3, 14-15, 166:2-3.) Law enforcement followed the vehicle to a nearby pharmacy, but then lost physical surveillance. (Tr. 66:25-67:15, 166:24-3.) Before physical surveillance was lost, however, corroborating pings were received from the phone; based on those pings law enforcement believed Defendant was headed to the Parklawn building. (Tr. 67:18-68:1.) When law enforcement arrived at the Parklawn building, the Acura was sitting unoccupied in the parking lot. (Tr. 70:2-5.) Law enforcement set up a perimeter around the Parklawn building and continued surveillance. (Tr. 68:1-6, 166:11-15.)

Shortly after a portion of the surveillance team left the Colfax apartment building to follow the Acura, law enforcement officers executed the search warrant for the Colfax apartment. (Tr. 71:7-9.) Inside a closet, they found a locked filing cabinet. (Tr. 72:6-9.) Officers forced open the filing cabinet and found approximately 15.144 kilograms of methamphetamine inside. (Tr. 72:10-13, 74:16-18; Ex. 5 at 5; Exs. 7A, 7D; Ex. 8.) Law

enforcement also found approximately 2 kilograms of marijuana in the apartment. (Tr. 71:13; Ex. 5 at 5; Exs. 7B, 7E; Ex. 8.)  The agents pursuing the Acura learned of this discovery shortly before arriving at the Parklawn building.  (Tr. 71:15-20.)  After setting up surveillance, law enforcement at the Parklawn building decided to arrest Defendant and his associates if they saw them.  (Tr. 75:2-5, 167:8-13.)

At approximately 2:30 p.m., law enforcement observed Defendant and Izazaga exit the building.  (Tr. 75:20-24.)  The two men headed towards the Acura and Defendant unlocked the car using a key fob.  (Tr. 75:24-76:2.)  Defendant got in the front passenger seat and Izazaga sat in a rear seat.  (Tr. 76:2-3, 167:19-21.)  Morales exited the Parklawn building shortly thereafter and made his way towards the driver's seat.  (Tr. 76:7-9.)  As Morales approached the car door, law enforcement approached and detained the men. (Tr. 76:10-12, 168:1-4.)  The agents approached with their weapons drawn and placed the men in separate vehicles.  (Tr. 79:16, 146:22-147:6.)  Law enforcement found a set of keys on the driver's seat, a foot and a half from where Defendant had been sitting. (Tr. 80:3-14; Ex. 9.)  The agents later learned these keys opened the Parklawn apartment, the exterior door of the Colfax apartment building, the deadbolt of the Colfax apartment, the turn-handle lock of the Colfax apartment, and the mailbox associated with the Colfax apartment.  (Tr. 192:23-25, 193:13-194:7.)

Once the men were detained, the agents sought to identify Izazaga and Morales. (Tr. 76:22-23.)  Before being placed in a vehicle, Agent Hamblen questioned Morales. (Tr. 79:22-24, 170:7-13.)  Morales gave his name and stated that he lived in the Parklawn

building in apartment 324 with his sister, Dafne. [3]  (Tr. 170:16-21.)  Morales stated that he did not know Defendant's last name or much about him, but that his first name was "Fernando."  (Tr. 170:23-171:1.)  Morales also stated that Izazaga was his uncle from California, but said that he did not know his name.  (Tr. 171:4-10.)  Agent Hamblen then spoke with Izazaga.  (Tr. 171:20-23.)  Izazaga provided his name, date of birth, and a California commercial driver's license.  (Tr. 171:25-172:2.)  Izazaga told Agent Hamblen that he was visiting the person getting in the driver's seat (Morales) and had stayed with him the past day or two in his apartment, but that he did not know Morales's name or address.  (Tr. 172:3-7.)  Izazaga said the apartment was on the third floor of the Parklawn building.  (Tr. 172:7-10.)

E.      Search of the Parklawn Apartment

With the information obtained from Izazaga and Morales, Agent Sokolov, Agent Hamblen and a third agent went into the Parklawn building to apartment 324. (Tr. 80:15-19, 172:20-23.)  Neither Agent Sokolov nor Agent Hamblen recalls how they gained entrance into the building.  (Tr. 147:13-16, 203:10-12.)  The agents proceeded to apartment 324 and knocked on the door.  (Tr. 174:5-7.)  A woman answered the door and identified herself as Dafne Morales.  (Tr. 174:16-18.)  Agent Hamblen, who was dressed in civilian clothes, showed her his badge and credentials.  (Tr. 174:20-23.)  Agent Hamblen informed Dafne that her brother and some other individuals had just been arrested in the parking lot and he wanted her to confirm some information.  (Tr. 174:5-9.) Agent Hamblen informed Dafne that she was not in any trouble, and she was not required

[3] It is at this time that law enforcement learned that Morales was not Padilla-Valle.  (Tr. 77:3-5.)

to speak to the agent. (Tr. 175:11-14.) Dafne confirmed her brother's identity but stated she did not know the individuals who were with him. (Tr. 176:2-9.) Dafne also stated that her newborn baby lived in the apartment with her and Morales. (Tr. 177:6-11.) Agent Hamblen then stated that if she liked, the agents "would be willing to come into [the] apartment so [the] neighbors wouldn't overhear this discussion about [her] family members being arrested." (Tr. 176:12-15.) Dafne opened the door wider and told them to "come on in." (Tr. 176:15-16.)

Once the agents were inside, they asked Dafne who was on the lease for the apartment; she responded that she and her stepfather were on the lease, but her brother was not. (Tr. 177:23-178:5.) Agent Hamblen asked Dafne if she wanted to talk in "back to where the child is, just so you could keep an eye on it." (Tr. 179:21-23.) Dafne agreed and they proceeded to a back room. (Tr. 180:1-3.) After Agent Hamblen informed her that lying would not help, Dafne told him that she did know Defendant, that they had dated for several months, that she knew him as "Fernando" but did not know his last name, and that he led a very secretive life. (Tr. 180:22-181:11.) Dafne further stated that Defendant lived at the Colfax apartment. (Tr. 181:15-18.) It appeared to Agent Hamblen that Dafne was very fluent in English, and at no point did she ask to speak in Spanish. (Tr. 181:11-22.)

Agent Hamblen asked Dafne for permission to search the apartment. (Tr. 183:7-8.) Dafne stated that there was nothing illegal in the apartment to her knowledge. (Tr. 183:10-12.) Agent Hamblen filled out a "Consent to Search" form which Dafne read and signed. (Tr. 183:18-21; Ex. 10.) Dafne stated "she was perfectly fine with the

English" version of the form and did not need a Spanish version. (Tr. 190:16-18.) During the interaction, Dafne was twice told that she could refuse to talk to the agents and ask them to leave. (Tr. 189:23-190:1.) She did not appear to be tired, sleep-deprived, mentally ill, hysterical, intoxicated, or agitated. (Tr. 185:19-186:19.) She was also never cuffed, threatened, or questioned about her immigration status, and the agents did not make any promises regarding prosecuting her brother. (Tr. 189:7-22.) Dafne was "very accommodating and friendly" towards the agents. (Tr. 176:19.)

In the bedroom Dafne identified as hers, various bags and effects were scattered in the area. (Tr. 85:12-17; Ex. 11C.) Dafne informed the agents that she had just recently moved in the night before. (Tr. 84:22-23.) When items were found, Dafne would indicate what they were or to whom they belonged. (Tr. 185: 5-7.) On the floor of that room, the agents found a black and gray Columbia jacket with bundles of currency in two different pockets. (Tr. 86:12-17; Exs. 11F, 11G.) Dafne stated that the jacket belonged to Defendant and that he had taken it off shortly before leaving the apartment. (Tr. 87:16-19.) The jacket also contained a set of three keys. (Tr. 90:20-22; Ex. 11O.) Law enforcement later discovered these keys opened the file cabinet containing methamphetamine in the Colfax apartment. (Tr. 91:1-3, 195:23-24.)

The agents also discovered a pair of jeans containing a large amount of currency in the pockets. (Tr. 87:12-14; Ex. 11H.) Dafne also identified these as Defendant's. (Tr. 87:24.) A Burberry bag, containing more bundles of U.S. currency, was found under the bed. (Tr. 88:1-8; Exs. 11I-11K.) Dafne stated the bag was not hers and denied knowing that it was there or that it contained any money. (Tr. 89:23-25.)

Defendant now seeks suppression of evidence. He argues that: (i) the dog sniff of the apartment hallway was a Fourth Amendment search conducted without a warrant; (ii) the warrant to search the Colfax apartment was based on the illegal dog sniff and thus the fruits of that search must be suppressed; (iii) the agents had no probable cause to arrest Defendant or search the Acura; and (iv) Dafne Morales could not consent to a search of Defendant's belongings at the Parklawn apartment.

## II.    ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It also provides that warrants will only be issued when probable cause is shown. *Id*. Warrantless searches are *per se* unreasonable unless an exception to the warrant requirement applies. *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971). When evidence is obtained in violation of the Fourth Amendment, the evidence may be suppressed. *See Davis v. United States*, 131 S. Ct. 2419, 2426 (2011).

### A.    Dog Sniff at the Colfax Apartment

Defendant first argues that the dog sniff of the hallway at the Colfax apartment building was a search pursuant to the Fourth Amendment and therefore required a warrant. Defendant bases his argument on *Florida v. Jardines*, 133 S. Ct. 1409 (2013). In *Jardines*, police received an unverified tip that marijuana was being grown at the defendant's home. *Id*. at 1413. Officers went to the front door of the home with a narcotic-detecting canine. *Id*. As they walked closer to the front porch, the dog sensed drug odors and began to trace them, eventually sniffing the base of the front door and

determining that to be the odor's strongest point. *Id*. The Court observed that the evidence was gathered on the house's curtilage, a constitutionally protected area. *Id*. at 1414. Because of this, the Court examined whether the investigation was achieved through an unlicensed physical intrusion. *Id*. at 1415. The Court explained that although the question of a search is often based on the reasonable expectation of privacy analysis, the "reasonable-expectations test 'has been *added to*, not *substituted for*,' the traditional property-based understanding of the Fourth Amendment . . . ." *Id*. at 1417 (quoting *United States v. Jones*, 132 S. Ct. 945, 951-52 (2012) (emphasis in original)). The first question to ask is whether a person is "on the constitutionally protected extension of [the] home." *Id*. at 1415.

Defendant's reliance on *Jardines* is misplaced because it cannot be said the common hallway of the apartment building was curtilage. Defendant relies on *United States v. Dunn*, 480 U.S. 294 (1987), to argue that the hallway is part of the curtilage of Defendant's home. The Court "identified the central component of this inquiry as whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *Id*. at 300 (internal quotations removed). This being the central component, it is difficult to equate this notion with the common hallway of an apartment building. A common hallway is used by residents to travel from their apartment to the outside door and back. This is not the area in which "intimate activities" are likely to occur.

The Court in *Dunn* identified four factors relevant to determining curtilage:

the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*Id*. at 301. Applying these factors from *Dunn* does not support finding a common hallway to be curtilage. The common hallway is close to the apartment in question and also within the enclosure surrounding it, meeting the first two factors. The third factor, however, weighs against a finding of curtilage. The nature of a common hallway is not used for intimate activities, but rather to permit residents of the building ingress and egress to the street. The fourth factor also weighs against a finding that a common hallway is curtilage. Although passers-by may not be able to see the hallway, those with whom he shares the hallway can still view the activities of the resident while in the hallway. Indeed, an apartment resident would most likely not be permitted to shield his activities in the hallway from the other residents, as they have the same right to access it that he does.

Furthermore, it is "well-settled" in the Eighth Circuit "that there exists no 'generalized expectation of privacy in the common areas of an apartment building.'" *United States v. Brooks*, 645 F.3d 971, 976 (8th Cir. 2011) (quoting *United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999)). The *Brooks* court found that a common staircase at a multi-family dwelling "can[not] be characterized as curtilage." *Id*. at 975. Here, the dog sniff occurred in a common hallway of an apartment building. Without an expectation of privacy in the hallway, it cannot have the same constitutional protections

as the curtilage around a house.  Accordingly, because the search at issue did not occur on a constitutionally protected extension of the home, *Jardines* is inapposite.

Assuming, *arguendo*, that the common hallway is a part of the curtilage of the apartment, continuing the analysis reveals that the search was objectively reasonable. Here again *Jardines* is inapposite.  *Jardines*, based on a trespass theory, addressed whether the officers had an implied license to be on the property.  There, the Court reasoned that an implied license would permit law enforcement to approach a home, knock, and then depart, but it would not permit bringing a police dog to sniff for incriminating evidence.  *Jardines*, 133 S. Ct. at 1415-16.  But the situation in this case does not involve an implied license.  Instead, the officers were in the apartment building's common hallway pursuant to the building manager's explicit license.  The officers said they would like to enter to perform a dog sniff, and the manager consented. As the manager of the complex, he has both a right of access to the common hallway of the building and the authority to allow the officers to walk through it.  *See United States v. Kelly*, 551 F.2d 760, 763 (8th Cir. 1997) (finding a seizure reasonable because an apartment manager has a degree of control over common areas and can permit law enforcement to access them).  Because the building manager let law enforcement into the building and had the authority to do so, the officers were there lawfully.  This being so, there was no trespass and no Fourth Amendment violation under *Jardines*.

Defendant cites *Bumper v. North Carolina*, 391 U.S. 543 (1968), to argue that the manager did not consent to let law enforcement in but instead submitted to the officers' authority.  *Bumper* involved a search that was consented to because the officers falsely

said they had a warrant to search. 391 U.S. at 546. The officers here made no such claim. Likewise, the facts in this case do not suggest that the law enforcement agents obtained the manager's consent through a showing of authority, coercion, or duress. Agent Bendum said the agents would like to do a dog sniff if they could get in. "There was no suggestion that he could not refuse. Thus we think the facts are wholly distinguishable from *Bumper* . . . ." *United States v. Harris*, 453 U.S 1317, 1322 (8th Cir. 1972). Defendant also correctly contends that a building manager does not have the authority to consent to a search of a tenant's dwelling. *See Chapman v. United States*, 365 U.S. 610, 616 (1961). The building manager here, however, did not grant the officers entry to Defendant's apartment. He gave them access to a common hallway— which he is permitted to do—but not the apartment itself. *See Kelly*, 551 F.2d at 763.

Defendant also relies on *United States v. Thomas*, 757 F.2d 1359 (2d Cir. 1985), to argue that the dog sniff was an illegal search. More recently, however, the Eighth Circuit resolved a factually similar situation in *United States v. Scott*, 610 F.3d 1009 (8th Cir. 2010). In *Scott*, as in here, officers were lawfully present in the common hallway of an apartment building. *Id*. at 1015. The court held that a dog "sniff of the apartment door frame from a common hallway did not constitute a search subject to the Fourth Amendment." *Id*. at 1016; *see also United States v. Roby*, 122 F.3d 1120, 1124 (8th Cir. 1997) (upholding dog sniff of hotel door from common hallway). This Court finds that because the officers were in the common hallway lawfully, the dog sniff did not constitute a search in violation of the Fourth Amendment.

### B. Search warrant for the Colfax apartment

Defendant next argues that the fruits of the search warrant executed at the Colfax apartment must be suppressed as the warrant itself was based on an illegal search, specifically the dog sniff of the apartment. Because this Court determined above that the dog sniff was not a search in violation of the Fourth Amendment, Defendant's challenge of the warrant for the Colfax apartment must fail.

### C. Arrest of Defendant and Search of the Acura

Defendant next asserts that law enforcement had no probable cause to arrest him and search the Acura. Probable cause to make a warrantless arrest exists when facts and circumstances lead a reasonable person to believe that a suspect is committing or has committed a crime. *United States v. Allen*, 713 F.3d 382, 386 (8th Cir. 2013). "To determine whether an officer 'had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" *Id*. (quoting *Maryland v. Pringle,* 540 U.S. 366, 371 (2003)).

At the time Defendant was detained, officers knew that Defendant was an undocumented alien who had previously been removed this country; they knew that they had previously conducted three controlled methamphetamine purchases involving Defendant; and they knew the results of the search of the Colfax apartment. Law enforcement could have arrested Defendant for any of these reasons. Based on this knowledge, it was reasonable for law enforcement to believe that Defendant had committed a crime. Accordingly, the Court determines that probable cause existed to arrest Defendant.

A search incident to arrest extends to the arrestee's person and the area within his immediate control. *Chimel v. California*, 395 U.S. 752, 763 (1969). In addition, "officers can constitutionally search items in a vehicle incident to an arrest '(1) if the arrestee is within reaching distance of the vehicle during the search, or (2) if the police have reason to believe that the vehicle contains evidence relevant to the crime of arrest.'" *Allen*, 713 F.3d at 386 (quoting *Davis*, 131 S. Ct. at 2425); *see also Arizona v. Gant*, 556 U.S. 332, 351 (2009) ("Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest."). In this case, Defendant was arrested for his connection to illegal drugs. This being so, law enforcement was permitted to search the Acura for evidence of that crime. The fruit of the search, including Defendant's keys, were legally found and are admissible.

### D.  Consent to Search of Parklawn Apartment

Finally, Defendant claims that the evidence seized in the search of the Parklawn apartment must be suppressed because Dafne Morales lacked authority to consent to the search of Defendant's items.

Law enforcement may perform a warrantless search of a residence based on an individual's consent if that individual is authorized to give consent and the consent is voluntary. *United States v. Maylock*, 415 U.S. 164, 171 (1974). Consent is valid "when an officer reasonably relies on a third party's demonstration of apparent authority" over the premises. *United States v. Lindsey*, 702 F.3d 1092, 1096 (8th Cir. 2013) (quoting

*United States v. Amratiel,* 622 F.3d 914, 915 (8th Cir.2010)). A "person with common authority over, or sufficient relationship to, the item to be searched" may give consent to a search. *United States v. James*, 353 F.3d 606, 613 (8th Cir. 2003). Even if that third party lacks common authority over the item, if officers reasonably rely on that apparent authority the search is lawful. *United States v. Nichols*, 574 F.3d 633, 636 (8th Cir. 2009). The Eighth Circuit "has been more liberal about allowing police to form their impressions from context" when it comes to questions of apparent authority to consent to a search. *See, e.g., United States v. Almeida-Perez*, 549 F.3d 1162, 1171 (8th Cir. 2008). When officers arrived at the Parklawn apartment, Dafne answered the door, stated that she lived there, and represented that her name was on the lease of the apartment. Taking the totality of the circumstances into consideration, it was reasonable for the agents to rely on Dafne's authority to consent to the search.

Voluntariness of consent requires an examination of the totality of the circumstances; relevant factors to consider include: the person's age, intoxication, whether the individual was informed of her *Miranda* rights, knowledge of legal protections, length of detention, threats or physical intimidation, promises or misrepresentations made by officers, whether the person was in custody, and whether the person simply stood by silently while the search ensued. *United States v. Golinveaux*, 611 F.3d 956, 959 (8th Cir. 2010). The agents in this case informed Dafne that she may refuse to consent to a search. Agent Hamblen also explained the search to her and gave her the consent form to read and sign, which she did. She did not appear intoxicated or otherwise impaired. The agents did not question her immigration status, promise to aid in

her brother's prosecution, or demand entry to the apartment.  There is "not the least suggestion that [she] was subjected to any form of pressure, coercion or duress."  *Harris*, 453 F.2d at 1322.  Moreover, Dafne did not silently sit by during the search but actively aided the agents in identifying items.  Under the totality of the circumstances, Dafne's consent to search the Parklawn apartment was valid.

Defendant challenges Dafne's authority to authorize the search of his possessions in her bedroom.  With respect to the bag[4] of currency found, this item was found under the bed in Dafne's bedroom.  Dafne had explicitly authorized a search of that room.  The bag itself was a Burberry shopping bag.  Burberry is a clothing brand that makes items for men and women.  Nothing would indicate to a reasonable officer that Dafne did not have authority over the bag. Accordingly, it was reasonable for the agents to rely on her authority over the bag and search it.

Defendant also challenges Dafne's authority to consent to a search of his jacket and jeans found on the floor of the bedroom.  Dafne told the agents that it was her bedroom and they were free to search.  She did not inform the agents the clothing was Defendant's until questioned about the items.  She had just recently moved in and items were strewn around the room.  Case law does not suggest that when conducting a consent search of a residence, officers must ask the party consenting if they have authority to consent to a search of every item found.  *Cf. Amratiel*, 622 F.3d at 917 ("When officers obtain valid third-party consent, they are not also required to seek consent from a

---

[4] Defendant suggests this bag was a "closed container."  The bag in question was a paper shopping bag with small handles at the opening.  It had no zipper, snaps, magnets, or any other way to keep the opening shut.  (*See* Exs. 11I-11K.)

defendant . . . .")  The agents searched Dafne's bedroom with her consent, and it was reasonable for them to rely on her apparent authority over the items within it.

### E.    Suppression of Electronic Surveillance

Defendant also sought suppression of the electronic surveillance done in the course of this investigation.  (*See* Motion to Suppress Electronic Surveillance, ECF No. 19.)  Defendant did not address this issue at oral argument, and he did not argue this Motion in his Memorandum.  The Government presented the Court with the warrants and their supporting affidavits.  Without argument on this issue from Defendant, and based on the exhibits received at the hearing, this Court will recommend denying this Motion.

## III.    RECOMMENDATION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Defendant's Motion to Suppress Electronic Surveillance (ECF No. 19) be **DENIED**; and

2.    Defendant's Motion to Suppress Fruits of Unlawful Search and Seizures (ECF No. 20) be **DENIED**.


Date: July 25, 2013                       s/ Tony N. Leung
                                          Tony N. Leung
                                          United States Magistrate Judge
                                          District of Minnesota

                                          *United States of America v. Penaloza-Romero*
                                          File No. 13-cr-36 (RHK/TNL)


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that

specifically identify the portions of the Report to which objections are made and the basis of each objection.  The Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before __**August 9, 2013.**